J-S40032-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: E.L.M., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.L.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 881 MDA 2025 |

Appeal from the Order Entered May 29, 2025
In the Court of Common Pleas of Juniata County Orphans' Court at
No(s): 0001-ADOPT-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: M.E.M. JR., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.L.M., MOTHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 882 MDA 2025 |

Appeal from the Order Entered May 29, 2025
In the Court of Common Pleas of Juniata County Orphans' Court at
No(s): 0002-ADOPT-2025

| | | |
|---|---|---|
| IN THE INTEREST OF: W.I.G., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: L.L.M., MOTHER, AND R.G., FATHER | : | |
| | : | |
| | : | |
| | : | No. 883 MDA 2025 |

Appeal from the Order Entered May 30, 2025
In the Court of Common Pleas of Juniata County Orphans' Court at
No(s): 0003-ADOPT-2025

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and MURRAY, J.

MEMORANDUM BY MURRAY, J.:                    **FILED: DECEMBER 23, 2025**

In these consolidated appeals, L.L.M. (Mother) appeals from the orders terminating her parental rights to her three children, E.L.M. (a daughter born in October 2018), M.E.M., Jr. (hereinafter M.E.M., a son born in December 2021), and W.I.G. (a son born in August 2023) (collectively, Children). Additionally, R.G. (Father), biological father of W.I.G., appeals from the order terminating his parental rights to W.I.G.[1] Eric A. Williams, Esquire (Counsel), appointed counsel for Mother and Father (collectively, Appellants), has filed a petition to withdraw as counsel and accompanying *Anders* brief.[2] After careful review, we grant Counsel's petition to withdraw and affirm the orphans' court's orders.

The orphans' court explained that the family came to the attention of Juniata County Children & Youth Services (JCCYS or the Agency) in June 2024, when Children "were found to be living in horrifying conditions" with

---

[1] M.M., biological father of E.L.M. and M.E.M., filed a petition for voluntary relinquishment of his parental rights to E.L.M. and M.E.M. The orphans' court granted the petition on May 29, 2025. M.M. did not appeal.

[2] *See Anders v. California*, 386 U.S. 738 (1967); *see also In re S.M.B.*, 856 A.2d 1235, 1237 (Pa. Super. 2004) (explaining that the *Anders* procedure for withdrawal of court-appointed counsel has been extended to appeals involving termination of parental rights).

J-S40032-25

Appellants.[3]  Orphans' Court Opinion, 9/12/25, at 2.  According to the orphans'

court,

> the original dependency action arose because the Agency … had a significant number of concerns, particularly regarding the home conditions and the parenting abilities of [Appellants.  N.T., 5/29/25,] at 12.  In regard to the conditions of the home, the Agency was concerned about an overwhelming pile of clutter and boxes throughout the home, as well as an infestation of pests[,] including cockroaches, bedbugs, and ants.  *Id.* at 13.  In regard to the Appellants' [parenting] abilities, the Agency had concerns about the Appellants' mental health, as well as their understanding [of] the basic needs of the Children.  *Id.* at 22-23. …  The Agency had concerns about the mealtimes of the Children and [whether] they were being provided enough nutrition.  There was an instance during a home visit when a curdled milk bottle was found in [W.I.G.'s] pack-and-play, and was easily accessible by [W.I.G.]  *Id.*  Further, there were severe hygiene concerns as the Children appeared unkempt, and suffered from lice infections. *Id.* at 24.
>
> When W.I.G. came into the Agency's care at the age of ten (10) months, he was considered underweight and behind developmentally, as he struggled to have any alertness, and showed no signs of any speech, or development with walking, or hand-to-eye coordination.  *Id.* at 47.  When M.E.M. came into the Agency's care, he was two (2) years old, and he had some behavioral issues, which included extensive physical and self-harm behaviors.  *Id.* at 47, 52-53.  E.L.M. came into the Agency's care when she was five (5) years old, [and] was sent to Southwood Psychiatric Hospital due to her suffering from severe behavioral and mental health issues.  *Id.* at 54.  E.L.M. would act out verbally and physically by kicking and biting other individuals,

---

[3] Mother and Children previously resided in Mifflin County, where they were involved with Mifflin County Children & Youth Services (MCCYS).  N.T., 5/29/25, at 173-75.  In October 2023, at MCCYS's urging, Mother's parents (maternal grandparents) sought and obtained physical and legal custody of Children.  *Id.*  In May 2024, Mother regained physical custody, but shared legal custody with maternal grandparents.  *Id.* at 32, 175, 177, 194-95.  At that time, Mother moved with Children to Juniata County, where they resided with Father and Father's mother (paternal grandmother).  *Id.* at 176-78.

including her siblings, and once[, E.L.M.] stabbed a cat that had lived in the family's home. *Id.* E.L.M. was also said to have delayed speech, and use[d] language that was quite vulgar. *Id.* at 55, 57.

On July 17, 2024, JCCYS obtained emergency custody of the Children due to Appellants' inability to handle the uncleanliness, clutter and pest infestation in the home, as well as multiple home visits that showed the Children without proper supervision, discipline, nutrition, and hygiene. [On July 29, 2024, the orphans' court adjudicated Children dependent. Due to Children's behavioral issues, the Agency placed them in three separate foster homes. *Id.* at 56-57. On March 5, 2025, a]fter many attempts … by the Agency to aid Appellants in making the changes necessary to properly care for and raise the … Children, the Agency filed [a] petition for involuntary termination of parental rights[,] as the Agency found that no progress was being made by [Appellants] in regard to the concerns that … led to the initial dependency matter. *Id.* at 41-42.

Orphans' Court Opinion, 9/12/25, at 2-4 (some capitalization modified).

The Agency's petition sought termination pursuant to 23 Pa.C.S.A. § 2511(a)(1), (2), (5), and (b). On May 29, 2025, the orphans' court held a hearing on the petition. Appellants were present and represented by Counsel. Brittany Shetter, Esquire, served as Children's guardian *ad litem* (GAL), and Mark Remy, Esquire, as their legal counsel. The orphans' court summarized the evidence presented at the hearing:

The Agency presented testimony from JCCYS caseworker Kelsey Drolsbaugh [(Ms. Drolsbaugh)], who testified to the timeline of the dependency [matters], and [detailed the] services the Agency attempted to provide to Appellants in order to provide a safe and stable home for the [Children], handle the basic needs of the Children, as well as care for themselves in a way that would better their hygiene, mental health, and parenting skills. [N.T., 5/29/25,] at 13. The physical condition of the home was atrocious, as there was an extraordinary amount of clutter

present, as well as significant infestations of cockroaches, bedbugs, ants, and flies. *Id.*

In order to help the insect and pest situation, the Agency offered to employ the help of Stoner's Pest Services to … provide extermination services. *Id.* at 14. Appellants refused to contact the pest services company on [their] own[. D]ue to the extreme amount of clutter within the home and the failed at-home extermination treatments attempted by Appellants, the pest control company was unable to perform the extermination services necessary. *Id.* at 15. … In regard to the clutter in the home, the Agency offered to purchase a dumpster for the family eighteen (18) times, and Appellants refused to accept the help. *Id.* at 35. …

Ms. Drolsbaugh testified that the Agency offered to assist Appellants with housing services, yet [Appellants] were unwilling to relocate, or even accept help to find a new residence that would make sure the Children were no longer living in a home filled with pests, complete disorganization, and unbelievable uncleanliness. *Id.* at 19. …

Appellants did eventually, after numerous attempts, agree to attend mental health services. [Mother] has, within 2025, consistently continued to attend her sessions, and Ms. Drolsbaugh has noticed a positive change in [Mother]. *Id.* at 22. [Mother] finally agreed to attend parenting classes [at] the Crossroads Program in December of 2024, after being requested to do so since July of 2024. *Id.* at 28.

[Ms. Drolsbaugh testified that] the Agency had valid concerns for … the Children's basic needs, as [Appellants] had issues regarding the Children's bathing, feeding, and diaper changing needs. *Id.* at 24. The Children suffered from lice, and due to the clutter of the home, it was likely the lice would return upon the Children returning to the home. *Id.* at 42. Further, there were concerns that … W.I.G. had been sleeping within a pack-and-play, and that during a home visit, Ms. Drolsbaugh noticed a curdled milk bottle within reach of W.I.G. in the pack-and-play. *Id.* at 23.

[Ms. Drolsbaugh testified that,] for the first three (3) months that the Children were considered dependent, Appellants made no progress, and showed no compliance with the Agency, [participation in offered] programs, or ability to care for the

- 5 -

Children. *Id.* at 40. Throughout the following six (6) months, Appellants began to show minimal compliance, yet no progress was being made on improving the concerns of the Agency. The same was true for the next (3) months, [with] minimal compliance by Appellants, but no progress was being made. *Id.* Due to [Appellants'] failure to progress towards a healthy change, the Agency filed the petition to terminate the parental rights of [Appellants]. *Id.*

[According to Ms. Drolsbaugh,] since being in their new foster homes, each Child has progressed significantly in their own personal milestones. Each Child is growing, both physically and emotionally, and all three (3) have been noted as doing well within their new homes. Due to the behavioral issues of each Child, it was determined that each Child was to go to a separate foster home. Each [foster] family intends to adopt their respective foster Child.

Orphans' Court Opinion, 9/12/25, at 5-7 (some capitalization and punctuation modified).

The orphans' court summarized the testimony of Madison Rheam (Ms. Rheam), the reunification caseworker assigned to the family from Clarvida, an organization that provided reunification counseling and visit supervision.

[Ms. Rheam] testified that throughout her time with Appellants, she[,] too[,] had offered homemaker services, including the dumpster, as well [as] aid in finding [alternative] low-income housing. [N.T., 5/29/25,] at 95. All of which [Appellants] refused. *Id.* She further testified that while working with Appellants through Zoom parenting sessions, … neither [Mother nor Father] took any accountability for any of the concerns in their parenting[. I]n fact, they would often blame the Children or [M.M.] for the Children's misbehaving. *Id.* at 99-100.

Further, [Ms. Rheam testified that] … Appellants never took [the parenting sessions] seriously[,] as they would claim that they already knew everything, they were often not within the video screen, or they were on their phones having side conversations. *Id.* at 100. The Appellants were unaware and unwilling to learn about the Children's age-based needs[,] such as the foods they

- 6 -

[should] be eating, and how they should be developing. *Id.* at 106.

Orphans' Court Opinion, 9/12/25, at 7-8 (some capitalization modified).

Finally, the orphans' court summarized Appellants' testimony:

Appellants presented the testimony of [Father] …. [Father] testified to changes that he believed were made within his home, as well [as] changes he believed he had made to his own personal care in response to the dependency petition being filed. [Father] testified to his own medical and mental health issues, [for] which he is currently under a physician's care…. [Father] claim[ed] that the [Agency's] concerns[,] such as the clutter within the home[,] ha[ve] been taken care of. [N.T., 5/29/25,] at 142-143. Throughout [Father's] testimony, the [orphans'] court found that [Father] was unaware or unable to understand the severity of the issues of not only the home, but the care of the basic needs of the Children. *Id.* Although [Father] agree[d] that he would continue with parenting classes, and that he would do anything to have the [Children] returned to his care, it was not shown that he willingly wanted to make a change. *Id.*

On rebuttal, the Agency called [Mother to testify. Mother] testified that she believed the only reason that the Children were taken into the care of the Agency [wa]s due to the conditions of their home, and that she was caring for the Children the best way that she could, and in the appropriate manner. *Id.* at 217. [Mother] was unable to comprehend that the services offered, especially the pest control and dumpster[,] were being provided to her by the Agency and she was not liable for any charges for services. *Id.* at 210-213. [Mother] was unable to take accountability, and testified that she was not the primary caregiver of her Children, and that [paternal grandmother] did not allow [Mother] to perform parental duties for the Children. *Id.* at 214.

Orphans' Court Opinion, 9/12/25, at 8-9 (some capitalization modified).

At the hearing's conclusion, GAL and Children's legal counsel stated their positions in favor of terminating Appellants' parental rights. N.T., 5/29/25, at 234-36. The orphans' court stated on the record its reasons for concluding

the Agency had met its burden of establishing grounds for termination under Section 2511(a)(2), (5), and (b).[4]  *Id.* at 236-46.  Following the hearing, the court entered orders terminating Mother's parental rights to all three Children, and Father's parental rights to W.I.G.

Appellants timely filed notices of appeal.  Contemporaneously, Counsel filed statements under Pa.R.A.P. 1925(c)(4), indicating his intent to withdraw pursuant to *Anders*.  The orphans' court filed an opinion under Rule 1925(a). This Court consolidated the appeals *sua sponte*.

Before reaching the substantive merits of these appeals, we address Counsel's petition to withdraw.  *See In re S.M.B.*, 856 A.2d at 1237 (stating that "this Court may not review the merits of the underlying issues until we address counsel's request to withdraw").  To withdraw from representation under *Anders*, counsel must

> 1) petition the court for leave to withdraw stating that, after making a conscientious examination of the record, counsel has determined that the appeal would be frivolous; 2) furnish a copy of the *Anders* brief to the appellant; and 3) advise the appellant that he or she has the right to retain private counsel or raise additional arguments that the appellant deems worthy of the court's attention.

*In re J.D.H.*, 171 A.3d 903, 907 (Pa. Super. 2017) (citation and brackets omitted).  Counsel must also "attach to [a] petition to withdraw a copy of the

---

[4] The orphans' court did not grant termination under Section 2511(a)(1).

letter sent to the[] client advising him or her of their rights." ***Commonwealth v. Millisock***, 873 A.2d 748, 752 (Pa. Super. 2005).

Additionally, a proper ***Anders*** brief must

(1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

***Commonwealth v. Santiago***, 978 A.2d 349, 361 (Pa. 2009).

Instantly, Counsel filed a petition to withdraw and an ***Anders*** brief asserting that Appellants' appeals lack merit and are frivolous. ***See*** Petition to Withdraw, 9/17/25, ¶ 3. In his petition, Counsel confirmed he conducted a conscientious review of the record. ***Id.*** Counsel included his letter to Appellants, which properly advised Appellants of their right to retain new counsel or proceed *pro se* to raise any other issues they deem worthy of this Court's attention. ***See id.***, Exhibit A. Counsel also provided Appellants with a copy of the ***Anders*** brief.

Counsel's ***Anders*** brief (a) summarizes the procedural history and facts of the case with citations to the record; (b) identifies issues that could arguably support Appellants' appeals; and (c) explains why the appeals are frivolous. Accordingly, Counsel has complied with the procedural requirements of ***Anders*** and ***Santiago***. Thus, we consider the substantive issues raised in the ***Anders*** brief.

- 9 -

The **Anders** brief identifies issues challenging whether the orphans' court erred or abused its discretion in terminating Appellants' parental rights under Section 2511(a)(2), (5), and (b).  **See Anders** Brief at 6, 22-28.

Our review of the orders terminating Appellants' parental rights

is limited to a determination of whether the [orders] of the [orphans'] court [are] supported by competent evidence.  When applying this standard, the appellate court must accept the orphans' court's findings of fact and credibility determinations if they are supported by the record.  Where the orphans' court's factual findings are supported by the evidence, an appellate court may not disturb the orphans' court's ruling unless it has discerned an error of law or abuse of discretion.

An abuse of discretion does not result merely because the reviewing court might have reached a different conclusion or the facts could support an opposite result.  Instead, an appellate court may reverse for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will.  This standard of review reflects the deference we pay to trial courts, who often observe the parties first-hand across multiple hearings.

In considering a petition to terminate parental rights, the orphans' court must balance the parent's fundamental right to make decisions concerning the care, custody, and control of his or her child with the child's essential needs for a parent's care, protection, and support.  Termination of parental rights has significant and permanent consequences for both the parent and child. As such, the law of this Commonwealth requires the moving party to establish the statutory grounds by clear and convincing evidence, which is evidence that is so clear, direct, weighty, and convincing as to enable a trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.

**Interest of M.E.**, 283 A.3d 820, 829-30 (Pa. Super. 2022) (citations and quotation marks omitted).

- 10 -

Termination of parental rights is governed by Section 2511 of the Adoption Act, which requires a bifurcated analysis. First, the orphans' court "must focus on the parent's conduct" relative to the enumerated grounds for termination set forth in 23 Pa.C.S.A. § 2511(a)(1)-(11). *Id.* at 830. If the court finds grounds for termination under Section 2511(a), it must then assess the evidence relative to the child's needs and welfare under Section 2511(b), "giving primary consideration to the developmental, physical and emotional needs and welfare of the child." *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013). This Court need only agree with the orphans' court as to "any one subsection of [Section] 2511(a), in addition to [Section] 2511(b), in order to affirm the termination of parental rights." *Int. of M.E.*, 283 A.3d at 830 (citation omitted).

Here, the orphans' court terminated Appellants' parental rights under Section 2511(a)(2), (5), and (b). We first address Appellants' challenge to the orphans' court's determination that the Agency established grounds for termination under Section 2511(a)(2). Section 2511(a)(2) provides:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

> * * *

> (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the condition and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

- 11 -

23 Pa.C.S.A. § 2511(a)(2).

To satisfy the requirements of Section 2511(a)(2), the petitioner must prove "(1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied." *In re A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (citation omitted). Grounds for termination under this subsection "are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied." *Id.*

"[S]ubsection (a)(2) does not emphasize a parent's refusal or failure to perform parental duties, but instead emphasizes the child's present and future need for essential parental care, control or subsistence necessary for his physical or mental well-being." *In re Z.P.*, 994 A.2d 1108, 1117 (Pa. Super. 2010) (citation omitted). "Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties." *In re C.M.K.*, 203 A.3d 258, 262 (Pa. Super. 2019). However, "while sincere efforts to perform parental duties, can preserve parental rights under subsection (a)(1), those same efforts may be insufficient to remedy parental incapacity under subsection (a)(2)." *In re Z.P.*, 994 A.2d at 1117 (citation omitted). We have recognized that a child's life "cannot be held in abeyance while a parent attempts to … assume parenting responsibilities. The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a

parent's claims of progress and hope for the future." *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa. Super. 2006).

Instantly, in its opinion, the orphans' court set forth the following findings, analysis, and conclusion under Section 2511(a)(2):

> The [orphans'] court noted the absolute lack of cooperation from Appellants, and their lack of understanding of the issues they have created and refuse to properly fix. The Appellants were offered services numerous times that would have aided them in cleaning up not only their home, but their lives, and they refused each time. The court properly [found] that all the instances referenced above[, *see* Orphans' Court Opinion 9/12/25, at 1-9,] showed [Appellants'] repeated and continued incapacity, neglect, or refusal to [provide] the Children with[] the essential parental care, control, and subs[iste]nce necessary for their physical and mental well-being as required under [Section] 2511(a)(2).
>
> Although Appellants have had the opportunity to allow [the Children's] maternal grandparents to provide substantial assistance with the care of the Children, Appellants have been unable and unwilling to use any assistance that has been offered to them[,] whether by the Agency or by family. The [orphans'] court found that [Appellants'] inability to change their ways over the course of time shows that there most likely will never be a change made by Appellants that would allow the Children to live in the proper environment.
>
> Under [Section] 2511(a)(2), the court found that over the two (2) year life of the case,[5] the issues still remain. The court properly noted that it is not a matter of how much money you make, or where you live, it is a matter of doing whatever needs to be done in order to properly take care of a child, bathe them, feed them, provide a safe place to live, help them grow, and show

---

[5] The orphans' court took into account the family's involvement with MCCYS prior to their relocation to Juniata County. *See* N.T., 5/29/25, at 240 (the orphans' court stating, "In the last two years there's been two months that these [Children] have been in [Appellants'] care," and "even during that two-month period," paternal grandmother "was the primary caregiver and she failed miserably.").

them love.  These Appellants were offered services to help them countless … times, and they refuse[d] to accept said services, or even take the initiative to make a change.  All of which [circumstances] show a continued incapacity, neglect or refusal to [provide] the Children with[] the essential parental care, control and subs[iste]nce necessary for their physical and mental well-being.

… The [orphans'] court notes and provides some credit to Appellants[,] in that they showed a small attempt at performing parental duties.  While not performing parental duties well, they did show up for Zoom video call visits with the Children,[6] [and Appellants] attended parenting classes[] and counseling.  However, there was credible testimony that showed Appellants, although physically present in classes and counseling, have not made significant changes or … shown the ability to take the Agency's concerns and services seriously.

Orphans' Court Opinion, 9/12/25, at 9-10 (some capitalization modified; footnotes added).  The orphans' court's findings are supported by the record and its legal conclusion is sound.

The orphans' court further rendered the following findings at the termination hearing's conclusion.  There, the orphans' court stated that "this is one of the most severe neglect-type cases" the court had ever seen, finding "the home conditions" and "the conditions of the [C]hildren were deplorable."  N.T., 5/29/25, at 237.  The court found that Father's testimony "proved" that

---

[6] The orphans' court observed that "the reason [Appellants] had [only] Zoom visits was due to the [pest] infestations, [and] due to the fact that the one in-person visit [Appellants] had, the [Children] came back with lice."  N.T., 5/29/25, at 244; *see also id.* at 46 (Ms. Drolsbaugh testifying that the in-person visit between Children and Appellants occurred at a park, "to be sure that we did not bring any bugs back to [the Agency's] offices"; that Children "contracted lice again and had to be re-treated" after the in-person visit; and that Appellants never asked Ms. Drolsbaugh to restore in-person visitation).

Father "is completely oblivious to the[] services offered and what the issues are in the case," raising concerns "of whether or not he has the ability to right the ship." *Id.* at 236. The orphans' court also found Mother's testimony demonstrated she "is somewhat oblivious to all the underlying issues in this case." *Id.* at 237; *see also id.* (finding Appellants' testimony demonstrated they did "not truly understand[] what the issues are and what they need to fix…."). The court found that Appellants "have shown that they cannot or will not remedy th[e] situation," and the evidence presented at the hearing demonstrated "that's [not] going to change…." *Id.* at 243.

As the orphans' court observed, Appellants "haven't shown the ability to use any assistance that's been offered to them in the last ten months…." *Id.* In addition, the court found that Appellants' "complete lack of cooperation" with the services offered by the Agency "contradict[ed]" Appellants' testimony "that they're willing to do anything to get these [C]hildren back." *Id.* at 241; *see also id.* at 242 (finding Appellants "were willing to do anything but change."). According to the orphans' court, Appellants repeatedly failed to adequately declutter their home, and failed to allow the pest control company to adequately treat the home. *Id.* at 237-41, 244-45; *see also id.* at 240 (the orphans' court noting "the whole problem with the clutter was because … the infestation can't be appropriately treated when the whole house is cluttered up like that."), 241 (noting the pest control company indicated the home "can't be appropriately treated until the clutter is picked up"), 242

- 15 -

(finding paternal grandmother refused to allow portions of the home to be treated by the pest control company, and Appellants acquiesced in her refusal), 242-43 (finding Appellants refused to take advantage of services offered to find new housing).

Our review confirms that the orphans' court's factual findings are supported by the record, and we discern no error or abuse of discretion in its conclusion that the Agency established grounds for termination under Section 2511(a)(2).[7]

We now turn to Section 2511(b), which provides as follows:

> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. …

23 Pa.C.S.A. § 2511(b).

"The plain language of Section 2511(b) clearly mandates that, in assessing the petition to terminate parental rights, the primary consideration must be the child's developmental, physical and emotional needs and welfare." *In the Interest of K.T.*, 296 A.3d 1085, 1105 (Pa. 2023) (quotation marks omitted). Courts "should consider the matter from the

_____

[7] Because we agree with the orphans' court that the Agency established grounds for termination under Section 2511(a)(2), we need not address whether the Agency established grounds under (a)(5). *See Int. of M.E.*, 283 A.3d at 830.

child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent." *Id.* This Court has repeatedly stated that "[i]ntangibles such as love, comfort, security, and stability are involved in the inquiry into the needs and welfare of the child." *In re C.W.U., Jr.*, 33 A.3d 1, 6 (Pa. Super. 2011) (citation omitted).

"[T]he court must consider whether a natural parental bond exists between child and parent, and whether termination would destroy an existing, necessary and beneficial relationship." *Interest of: J.R.R.*, 229 A.3d 8, 12-13 (Pa. Super. 2020) (citation and quotation marks omitted). However, "the parental bond is but one part of the overall subsection (b) analysis." *Interest of K.T.*, 296 A.3d at 1113.

> The Section 2511(b) inquiry must also include consideration of other important factors such as: the child's need for permanency and length of time in foster care …; whether the child is in a preadoptive home and bonded with foster parents; and whether the foster home meets the child's developmental, physical, and emotional needs, including intangible needs of love, comfort, security, safety, and stability.

*Id.* (footnote and citations omitted).

Instantly, the orphans' court "found that a bond between Appellants and the three … [C]hildren was absent, and it was proper for [Appellants'] parental rights … to be terminated in the best interest of the [C]hildren." Orphans' Court Opinion, 9/12/25, at 10; *see also* N.T., 5/29/25, at 245-46 (orphans' court finding "that at this point in time there is not a bond between [Father] and [W.I.G. or between Mother] and her three [C]hildren," and finding it is "in

- 17 -

the best interest of the [C]hildren based upon the record established today that the parental rights of [Appellants] be terminated.").

Our review confirms the orphans' court's findings are supported by the record. Ms. Rheam, who supervised Appellants' visits with Children, testified that there did not appear to be "any connection" between Appellants and Children. N.T., 5/29/25, at 112. Ms. Rheam testified that she did not observe any parent-child bond between Appellants and Children. *Id.* at 113. Ms. Rheam also testified that Children referred to their respective foster mothers as mom, and looked to the foster mothers for parental support. *Id.* at 113-14.

Ms. Drolsbaugh testified that W.I.G. is in a pre-adoptive foster home, has a "very positive" relationship with his foster parents, and calls his foster parents mom and dad. N.T., 5/29/25, at 49, 51. Prior to his placement in foster care, W.I.G. "was behind developmentally" and "had been … diagnosed with failure to thrive[.]" *Id.* at 47. In foster care, W.I.G. began receiving early intervention services and has seen improvements in his sleep, appetite, speech, walking, alertness, problem-solving, and interactions with people. *Id.* at 48, 51. W.I.G. also has positive relationships with his foster family's other children. *Id.* at 51.

Ms. Drolsbaugh testified that M.E.M. is in a pre-adoptive foster home. *Id.* at 54. Before his placement in that home, M.E.M. "struggled with extensive physical and self-harm behaviors," including hitting and biting

- 18 -

himself and other children. *Id.* at 53. Ms. Drolsbaugh testified that M.E.M. has experienced "[s]ignificant[]" improvement with these issues since his placement in the foster home. *Id.*

Ms. Drolsbaugh testified that E.L.M. was initially hospitalized at Southwood Psychiatric Hospital upon her removal from Appellants' care. *Id.* at 54. E.L.M. "struggled with her mental health needs[,] and physically and verbally act[ed] out with kicking, hitting, [and] harming other people, as well as having significant vulgar language and delayed speech." *Id.* at 55; *see also id.* at 57 (Ms. Drolsbaugh testifying that E.L.M. had stabbed a cat). Ms. Drolsbaugh also testified that when E.L.M. came into foster care, "she was very parentified," and "felt the need to do chores to care for her foster home and tried to care for the other children in the foster home." *Id.* at 55. During visits with M.E.M. and W.I.G., E.L.M. did "the same thing," trying "to pick them up and hold them and take care of them." *Id.*

Ms. Drolsbaugh testified that E.L.M. now has an individualized education plan "and a school-based team of supports …, and also receives play therapy counseling with Danette Dupree."[8] *Id.* Under the care of her foster parents, E.L.M.

---

[8] Danette Dupree (Ms. Dupree), who specializes in child trauma therapy, testified at the termination hearing that she began treating E.L.M. in August 2024. N.T., 5/29/25, at 125-27. At that time, according to Ms. Dupree, E.L.M. suffered from attention deficit disorder, oppositional defiant disorder, disorganized attachment, and post-traumatic stress disorder. *Id.* at 128. Ms.
*(Footnote Continued Next Page)*

has really come a far way with having to learn to interact with kids and be a kid and not have to be a caregiver to the children around her. … [E.L.M.] has learned appropriate interactions with children her age … and has even improved with interactions with her brothers. … She is doing really well [in school and] her speech [has improved]. … And she has a really strong relationship with the children in the foster home with interacting, playing with them, making plans to go do things in the community, these interactions are really strong….

*Id.* at 55-56.

Ms. Drolsbaugh testified that E.L.M. is in a pre-adoptive foster home and

has a very strong relationship with [her foster parents.] … She refers to them as mom and dad and has really formed a good relationship with them. She's able to process any behaviors that she does still have when she's triggered and is able to come back from them very well by working with her foster parents.

*Id.* at 56. Ms. Drolsbaugh testified that E.L.M.'s foster parents have addressed her mental health needs, and her "emotional regulation and self-control has improved." *Id.*

Ms. Drolsbaugh testified that the three Children have sibling visits with one another, and "see each other and visit each other regularly[.]" *Id.* at 58. She testified that the respective foster parents "all [live] within 30 minutes of

---

Dupree opined that these issues were caused by parental neglect and "the toxicity at home[.]" *Id.* at 130. Ms. Dupree testified that E.L.M. initially "had a very strong need to express to me … that she was her brothers' parent," and "she felt she needed to parent her two younger brothers." *Id.* at 132. Though Ms. Dupree had not observed E.L.M. with Mother, Ms. Dupree opined that E.L.M.'s therapy sessions suggested "there is not attachment" between E.L.M. and Mother. *Id.* at 131. Ms. Dupree testified that E.L.M. calls her foster parents mom and dad, and is building "a very strong bond" with them. *Id.* at 135. Ms. Dupree testified that E.L.M. has experienced significant improvement, "[b]ut it's going to be a while for her to get where she needs to be [after] everything that's happened." *Id.* at 131.

each other … and all intend to support fostering the relationship between the siblings….” *Id.* Ms. Drolsbaugh indicated the foster parents communicate with each other and have taken the initiative to bring the Children together beyond the visits scheduled by the Agency. *Id.* at 58-59.

In light of the above evidence, we discern no abuse of discretion or error of law in the orphans' court's determination that the Agency established grounds for termination under Section 2511(b).

Based upon the foregoing, we agree with Counsel's assessment that Appellants' appeal is frivolous. We therefore grant Counsel's petition to withdraw, and affirm the orders terminating Appellants' parental rights.

Petition to withdraw granted. Orders affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 12/23/2025